**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   Case No.  21-cv-808-DWD |
| | ) |
| **$146,400.00 IN UNITED STATES** | ) |
| **CURRENCY,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |
| **WIN CHEN,** | ) |
| | ) |
| **Claimant.** | ) |

**MEMORANDUM AND ORDER**

**DUGAN, District Judge:**

In this civil asset forfeiture case, and pursuant to 21 U.S.C. § 881(a)(6), the Government seeks to forfeit $146,400.00 in United States Currency that was seized during a traffic stop (Doc. 1).  Claimant Win Chen contests the forfeiture (Docs. 8, 21).  Now before the Court are Claimant Chen's Motion to Suppress (Doc. 35) and the Government's Motion for Summary Judgment (Doc. 34).  The Government opposes Claimant's Motion to Suppress (Doc. 36).  Claimant did not file a response to the Government's Motion for Summary Judgment.  For the reasons detailed below, Claimant's Motion to Suppress will be denied, and the Government's Motion for Summary Judgment will be granted.

**Background and Procedural History**

On January 14, 2021, Task Force Officers ("TFO") with the Drug Enforcement Administration conducted a traffic stop on Interstate 55 in Madison County, Illinois as

1

part of the Drug Enforcement Administration's Operation Trojan Warrior Enforcement Program (Declaration of TFO Larry Brantley, at Doc. 1-1). Claimant was the driver of the stopped vehicle, and the vehicle had an Oklahoma registration (Doc. 1-1 at ¶¶ 1-2). TFO Larry Brantley submitted a declaration of the traffic stop (Doc. 1-1). According to TFO Brantley, he and TFO Brad Blake stopped Claimant's vehicle for improper lane usage (Doc. 1-1, ¶ 1).

During the traffic stop, Claimant informed TFO Blake that he was traveling back home to Oklahoma after vising his family for two days in New York (Doc. 1-1, ¶ 3). Claimant also told TFO Blake that he was watching the patrol vehicle while he was driving (Doc. 1-1, ¶ 4). While speaking with Claimant, TFO Blake observed a large amount of paperwork, trash, and food wrappers scattered throughout the vehicle (Doc. 1-1, ¶ 3). TFO Blake believed Claimant was suspicious of law enforcement and that the presence of the patrol vehicle made Claimant nervous and caused him to commit the traffic violation (Doc. 1-1, ¶ 4).

While TFO Blake was speaking with Claimant, TFO Brantley searched law enforcement databases and learned Claimant had previously been charged with driving with an invalid/suspended license in Texas (Doc. 1-1, ¶ 4). After speaking with Claimant, TFO Blake returned to the patrol vehicle to speak with TFO Brantley. At that time, based on their training and experience, it was "well known to the TFOs that Oklahoma is now a source location for the cultivation of marijuana." (Doc. 1-1, ¶ 6). TFO Brantley also believed that Claimant's travel behavior was strange because he had traveled nearly twenty-four hours each direction for only a two-day stay (Doc. 1-1, ¶ 6). According to

2

TFO Brantley, the combination of factors, including Claimant's nervous behavior which led him to commit a traffic violation, his odd travel itinerary, and the correlation of traveling to a known source location, led the TFOs to believe that Claimant was involved in criminal behavior (Doc. 1-1, ¶ 6). Accordingly, the TFOs decided to ask for consent to search Claimant's vehicle for contraband and to detain the vehicle for a K9 sniff if consent was not given (Doc. 1-1, ¶ 6).

TFO Blake returned to Claimant's vehicle (Doc. 1-1, ¶ 7). TFO Blake indicated that the traffic stop was concluded and issued Claimant a verbal warning. However, TFO Blake then asked Claimant if there was anything illegal inside the vehicle and gave examples, including marijuana, cocaine, methamphetamines, heroin, illegal weapons, and large amounts of United States Currency (Doc. 1-1, ¶ 7). Claimant responded "no", and then declined TFO Blake's request to search the vehicle (Doc. 1-1, ¶ 7). TFO Blake then informed Claimant that the vehicle would be detained for a K9 sniff (Doc. 1-1, ¶ 7).

Another officer, TFO Degener, deployed his K9 Blu and conducted a free air sniff of the vehicle (Doc. 1-1, ¶ 8). Claimant remained inside the vehicle during the exterior sniff of the vehicle (Doc. 1-1, ¶ 8). After completing the K9 sniff, TFO Degener advised the TFOs that K9 Blu indicated on the vehicle for the odor of narcotics (Doc. 1-1, ¶ 8). TFO Trebeau and Samento then arrived on the scene and assisted with the search of Claimant's vehicle. Upon searching the rear passenger area of the vehicle, the TFOs located "several rubber-banded bundles of United States currency inside of plastic grocery bags underneath the rear bench seat." (Doc. 1-1, ¶ 9). The TFOs also "located additional bundles of United States currency inside of plastic grocery bags underneath

the front driver's bucket seat." (Doc. 1-1, ¶ 10).  Claimant stated that the currency inside the vehicle amounted to "One-hundred and twenty thousand" and belonged to him and others (Doc. 1-1, ¶¶ 10, 11).

Claimant was arrested on suspicion of Money Laundering (Doc. 1-1, ¶ 10).  A K9 sniff later confirmed the odor of narcotics on the seized currency (Doc. 1-1, ¶ 15).  The total amount of seized currency was $146,400.00 (Doc. 1-1, ¶ 16).  A more thorough search of Claimant's vehicle also revealed miscellaneous paperwork describing a marijuana cultivation business named Chen's Green Farms LLC located in Elk City, Oklahoma (Doc. 1-1, ¶ 13).

 On July 15, 2021, the Government filed a Verified Complaint for Forfeiture in this Court alleging that the seized currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, or traceable to such an exchange (Doc. 1).  On July 28, 2021, the Government issued a Direct Notice of Civil Judicial Forfeiture indicating that potential claimants must file a claim within 45-days, or by September 11, 2021 (Doc. 4).  The Notice was mailed to Claimant by regular and certified mail (Doc. 4).

On September 9, 2021, Claimant's counsel filed an answer to the Verified Complaint (Doc. 8).  However, Claimant did not file a claim before the 45-day deadline. Instead, on October 7, 2021, Claimant sought leave to file his verified claim (Doc. 13), which the Court granted over the Government's objection (Doc. 20).  On February 10, 2022, Claimant filed his claim, asserting that he is "the rightful owner of the claimed property because it comprised of my personal savings and money borrowed from a

4

friend, for the purpose of starting and maintaining a garden supplies and home renovation business." (Doc. 21).

On October 24, 2022, the Court granted the parties' agreed motion to extend discovery deadlines (Doc. 32).  This order reset the discovery cut-off deadline to December 2, 2022, and directed dispositive motions to be filed by January 3, 2023 (Doc. 32).  On October 31, 2022, the Government served Requests for Admissions on Claimant pursuant to Fed. R. Civ. P. 36 (Doc. 33).  To date, Claimant has not responded to those Requests for Admissions.  On January 3, 2023, the Government filed its Motion for Summary Judgment (Doc. 34).  Claimant did not file a response to the Government's Motion.  Instead, on January 30, 2023, and after the dispositive motion deadline passed, Claimant filed a Motion to Suppress (Doc. 35).  The Government opposes Claimant's Motion (Doc. 36).

## Summary of Standards Applicable to Civil Forfeiture

Under 21 U.S.C. § 881(a)(6), all money "furnished or intended to be furnished by [a] person in exchange for a controlled substance", and "all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter" are subject to forfeiture to the United States. *See also United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 451 (7th Cir. 1997).  The United States may seek the civil forfeiture of seized funds under 18 U.S.C. § 983(c); 21 U.S.C. § 881(b); *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005).  As the party seeking forfeiture, the Government bears an initial burden to show that property is subject to forfeiture, by a preponderance of the evidence.  18 U.S.C.

§ 983(c); *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 454.

Further, to establish that the seized funds were the proceeds of, or intended to facilitate, an illegal drug transaction, the United States must demonstrate a nexus between the seized property and illegal drug activity. *See* 18 U.S.C. § 983(c)(3); *$506,231 in U.S. Currency*, 125 F.3d at 451. To make this showing, the Government may use direct evidence, circumstantial evidence and hearsay evidence to show a nexus between the seized property and illegal activity. *$506,231 in U.S. Currency*, 125 F.3d at 451; *United States v. 304,980 in U.S. Currency*, No. 12-CV-0044-MJR-SCW, 2013 WL 785113, at *2 (S.D. Ill. Mar. 1, 2013). "After this showing is made, the 'ultimate burden shifts to the claimant' to prove that the property is *not* subject to forfeiture by demonstrating that the property was not used in connection with any illegal activity." *$304,980 in U.S. Currency*, 2013 WL 785113, at *2 (citing *$506,231 in U.S. Currency*, 125 F.3d at 451); *see also United States v. All Assets & Equip. of W. Side Bldg. Corp.*, 58 F.3d 1181, 1187 (7th Cir. 1995). "If the claimant fails to rebut the government's proof, the probable cause showing, standing alone, will support a judgment of forfeiture." *$506,231 in U.S. Currency*, 125 F.3d at 451

Civil forfeiture is an *in rem* proceeding. *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018). Therefore, the property itself is treated as being guilty of the wrongdoing, opposed to the property owner's culpability. *See United States v. Ursery*, 518 U.S. 267, 275 (1996); *United States v. $128,915.00*, No. 20-CV-00667-JPG, 2021 WL 2432064, at *2 (S.D. Ill. June 15, 2021). Thus, even when there is no criminal prosecution, the Government can seize

currency that it believes is traceable to drug trafficking. *See* 18 U.S.C. § 983(a)(3)(B); 21 U.S.C. § 881(a)(6). Nevertheless, "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *Martov v. United States*, 926 F.3d 906, 909 (7th Cir. 2019) (citing *United States v. One 1936 Model Ford V-8 De Luxe Coach, Motor No. 18-3306511*, 307 U.S. 219, 226 (1939)).

To launch a civil asset forfeiture proceeding, the Government must first file a complaint that alleges "sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of proof at trial." Supplemental Rule G(2)(f) of the Federal Rules of Civil Procedure (hereinafter "Supplemental Rule G"). "A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Supplemental Rule G(5)(a)(i). With these principles in mind, the Court turns to the pending motions.

<u>**Motion to Suppress**</u>

On January 30, 2023, Claimant filed a Motion to Suppress challenging the TFOs' extension of the initial traffic stop and K9 sniff (Doc. 35). Claimant does not contest the propriety of the initial stop. Instead, Claimant asks that all evidence obtained after TFO Blake issued Claimant the verbal warning be suppressed as violative of the Fourth Amendment. The Government opposes the Motion, arguing that the TFOs had reasonable suspicion to detain Claimant's vehicle and call for a K9 sniff such that the stop was lawfully extended for an investigation into additional illegal activity (Doc. 36).

"While there has been some debate as to whether the exclusionary rule should apply in civil forfeiture proceedings, district courts presented with motions to suppress

in civil forfeiture actions typically resolve the merits of the claimant's Fourth Amendment challenge." *United States v. $968,955.00 in United States Currency*, No. 20-CV-1351-NJR, 2022 WL 1605335, at *3 (S.D. Ill. May 20, 2022) (collecting cases) (citing *United States v. Marrocco*, 578 F.3d 627, 642–43 (7th Cir. 2009) (Easterbrook, J., dissenting) (expressing doubt that the exclusionary rule applies to civil asset forfeitures)).  Currently, the Court finds no reason to depart from this practice.  *See, e.g.*, *United States v. $96,480.00 in United States Currency*, No. 15-CV-0573-MJR-RJD, 2017 WL 1021292 (S.D. Ill. Mar. 16, 2017) (questioning the applicability of exclusionary rule-based suppression motions in civil forfeiture proceedings, but noting that the Seventh Circuit has not squarely held the exclusionary rule inapplicable to such proceedings).

Supplemental Rule G(8)(a) does not set forth any specific timing limitations on the filing of a motion to suppress in a civil forfeiture action.  *See United States v. $33,330.00 in U.S. Currency*, 901 F. Supp. 2d 1354, 1357 (N.D. Ga. 2012); *United States v. Approximately $658,830.00 in U.S. Currency*, No. 2:11-CV-00967 MCE, 2011 WL 5241311, at *4 (E.D. Cal. Oct. 31, 2011).  However, this Court's Local Rules and the Scheduling Order entered in the case do limit the time within which parties must file motions. Specifically, the Court's Scheduling Order (Doc. 16), as modified by the Order at Doc. 32, set a deadline of January 3, 2023 for filing dispositive motions.  The Scheduling Order further provides that "[d]ispositive motions filed after this date will not be considered by the Court." (Doc. 18-1, ¶ 9).

Claimant filed his Motion to Suppress on January 30, 2023, and after the filing deadline for dispositive motions (Doc. 35). While the Government does not object to

Claimant's Motion as untimely (Doc. 36), the Court questions the timeliness of Claimant's Motion and his motivation for waiting over two years from the seizure to formally raise his suppression issue.  *See, e.g.*, *$33,330.00 in* U.S. Currency, 901 F. Supp. 2d at 1359 (acknowledging that a moving party may have a tactical decision to delay formally raising a suppression issue, but that "[s]uch a tactical decision does not establish good cause").  Nevertheless, as the Government does not object to the timeliness of Claimant's Motion, the Court will ignore this procedural deficiency and resolve the Motion on its merits.

Claimant's Motion is short, containing only six substantive paragraphs (Doc. 35). The Motion is further unsupported by any declaration or verification.  Instead, Claimant adopts the facts of the traffic stop as presented in Paragraphs 1 and 4 of the Government's Motion for Summary Judgment (Doc. 35, ¶ 1; Doc. 34, ¶ 4).  Indeed, Claimant fully incorporates the following excerpt of the facts from Paragraph 4 of the Government's Motion, stating:

> "4. TFO Blake returned to CHEN's vehicle and returned CHEN's driver's license and concluded the traffic stop by issuing CHEN a verbal warning. TFO Blake then asked CHEN if there was anything illegal inside the vehicle and gave examples, including marijuana, cocaine, methamphetamines, heroin, illegal weapons, and large amounts of United States Currency. CHEN responded "no" to everything mentioned by TFO Blake. TFO Blake asked CHEN if it was ok if the TFOs searched the vehicle and CHEN refused. TFO Blake informed CHEN that the vehicle would be detained for a K9 sniff. TFO Blake returned to the patrol vehicle while TFO Brantley contacted TFO Jake Degener (TFO Degener) to respond to the traffic stop with his K9, Blu, Id."

(Doc. 35, ¶ 1).  Claimant argues that once TFO Blake issued Claimant his verbal warning and verbally concluded the traffic stop, Claimant should have been free to leave, but was

instead illegally detained.  Thus, Claimant asks that all evidence obtained after TFO Blake issued Claimant the verbal warning be suppressed as violative of the Fourth Amendment.

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  An investigatory traffic stop complies with the Fourth Amendment "if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime."  *United States v. Uribe*, 709 F.3d 646, 649–50 (7th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968), *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008)); *see also United States v. Ross*, 456 U.S. 798, 806–807 (1982) (recognizing that "an immediate intrusion" "of an automobile in transit" is not unreasonable "in cases involving the transportation of contraband goods.").  "An officer initiating an investigatory stop must be able to point to 'specific and articulable facts' that suggest criminality so that he is not basing his actions on a mere hunch."  *Uribe*, 709 F.3d at 649–50 (quoting *Terry*, 392 U.S. at 21–22).  However, "[t]he officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry."  *Id.* (citing *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011)).

The Government bears the burden of establishing reasonable suspicion "by a preponderance of the evidence."  *Id.* at 650.  But reasonable suspicion itself "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  "Reasonable

10

suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Courts therefore evaluate reasonable suspicion by examining "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Bullock*, 632 F.3d at 1012. "If there is no reasonable suspicion of criminal activity, a traffic stop can only last as long as it takes to 'address the traffic violation that warranted the stop' and 'attend to related safety concerns.'" *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). In other words, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. "However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007).

As a preliminary matter, Claimant does not dispute the material facts as they have been presented to the Court. This includes the allegations presented in the declaration of

TFO Brantley attached to the Government's Verified Complaint (Doc. 1-1).  Although Claimant filed an Answer generally denying the allegations presented in TFO Brantley's declaration (Doc. 8), Claimant has not provided contrary evidence to create a dispute of material fact.  Thus, the Court may rule on the Motion without a hearing.  *See United States v. Curlin, 638 F.3d 562, 564 (7th Cir. 2011)* ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion."); *United States v. Walker, 237 F.3d 845, 850 (7th Cir. 2001)* ("A defendant who seeks a hearing to suppress evidence has the burden to show that there are disputed issues of material fact.").

Claimant argues that the officers conducted an unreasonable search and seizure by prolonging the stop to conduct a K9 sniff after TFO Blake returned Claimant's driver's license and issued Claimant a verbal warning.  However, in focusing on the specific events in only Paragraph 4 (Doc. 35, ¶ 1), Claimant ignores the other circumstances presented in the declaration of TFO Larry Brantley (Doc. 1-1) and known to the officers at the time of the stop.  These additional circumstances include the TFOs' knowledge of Claimant's criminal history and travel itinerary, the TFOs' observations of Claimant's nervousness and suspicion of law enforcement, the TFOs' observations of Claimant's vehicle, and the TFOs training and experience which led them to know Claimant was traveling to a "well known" source location for the cultivation of marijuana (Doc. 1-1, ¶¶ 4, 6).

As further detailed in TFO Brantley's declaration (Doc. 1-1), the TFOs believed Claimant was involved in criminal behavior based on his traveling to and from a well

12

known source location for marijuana, his travelling a long distance for a very short stay, the "large amount of paperwork, trash, and food wrappers scatted throughout the vehicle", and Claimant's nervousness which led him to commit a traffic violation (Doc. 11, ¶¶ 3-4, 6).  Thus, according to the TFOs, they believed Claimant was involved in criminal behavior and decided to ask for consent to search Claimant's vehicle for contraband and detain the vehicle for a K9 sniff *before* TFO Blake returned to Claimant's vehicle to issue Claimant his verbal warning (Doc. 1-1, ¶ 6).

In *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the Supreme Court expressly "preclude[d the] sort of divide-and-conquer analysis" presented in Claimant's Motion. Instead, district courts must consider the totality of the circumstances when evaluating whether reasonable suspicion of criminal activity existed to justify a prolonged traffic stop.  See *Arvizu*, 534 U.S. at 274 ("[W]e have said repeatedly that [reviewing courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."). This "totality of the circumstances" process "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 274.

If the Court viewed only TFO Blake's statements after returning to Claimant's vehicle in isolation, as Claimant urges the Court to do, then in isolation these statements are not enough to carry the Government's burden.  However, when considering the totality of the circumstances, the facts establish that the TFOs developed a reasonable suspicion of criminal activity justifying the prolonged traffic stop and K9 sniff *before* TFO

Blake returned to Claimant's vehicle and verbally concluded the traffic stop.  The TFOs articulated specific indicators of criminal activity—including Claimant's travelling to a recognized source location for the cultivation of marijuana, Claimants' visible nervousness and suspicion of law enforcement, his strange travel itinerary, and the large amounts of trash and paperwork in Claimant's vehicle—that establish a reasonable suspicion of criminality and therefore justified further investigation. *See, e.g.*, *Illinois*, 528 U.S. 119 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 467 (recognizing that a claimant travelling to "a recognized source city for illegal narcotics" is a relevant factor supporting forfeitability); *$128,915.00*, 2021 WL 2432064 (finding reasonable suspicion to prolong a traffic stop because claimant was traveling to a recognized source for marijuana cultivation, exhibited increased nervousness, and communicated inconsistent explanations for his travel).

The relevant question here is "whether the officers had a reasonable suspicion of criminal activity *at the time of the seizure*."  *$128,915.00*, 2021 WL 2432064 (emphasis in original).  "[M]ore importantly, the reasonable-suspicion standard is low and can turn on information that is less reliable than probable cause."  *Id.*  Accordingly, taken as a whole, the specific and articulable facts presented by the TFOs here established reasonable suspicion at the time of the seizure to justify prolonging the traffic stop, detaining Claimant's vehicle, and calling for a K9 sniff.  In sum, there was no Fourth Amendment violation, and Claimant's Motion to Suppress (Doc. 35) is **DENIED**.

## Motion for Summary Judgment

Having found no Fourth Amendment violation, the Court turns next to the Government's Motion for Summary Judgment (Doc. 34).  Claimant did not respond to the Government's Motion for Summary Judgment.  Local Rule 7.1 permits the Court to consider Claimant's failure to respond to the Government's Motion as an admission of the merits of the Motion.  *See* SDIL-LR 7.1.  The Court finds it appropriate to exercise its discretion here, and **FINDS** that the Claimant's failure to respond is an admission of the merits of the Government's Motion.  Accordingly, and as further detailed below, the Governments' Motion will be granted.

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). The non-moving party may not resist summary judgment simply by resting upon the allegations contained in the pleadings. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997). "[F]actual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted); *see also LINC Finance Corp.*, 129 F.3d at 920 ("[A] genuine issue of material fact is not shown by the mere existence of 'some alleged factual

dispute between the parties,' or by 'some metaphysical doubt as to the material facts,' . . . [but] only if 'a fair-minded jury could return a verdict for the non-moving party on the evidence presented.'") (internal citations and markings omitted).

The Government argues that the seized currency is subject to forfeiture under 21 U.S.C. § 881(a)(6) as money intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, or money used or intended to be used to facilitate a violation of 21 U.S.C. § 881 (Doc. 35).  To establish that the currency is appropriate for forfeiture, the Government must demonstrate, by a preponderance of the evidence, that the currency were the proceeds of, or intended to facilitate, an illegal drug transaction.  *See* 18 U.S.C. § 983(c)(1); *$506,231 in U.S. Currency*, 125 F.3d at 451. The Government must also demonstrate a nexus between the seized property and illegal drug activity. *See $506,231 in U.S. Currency*, 125 F.3d at 451. To make this showing, the Government may use direct evidence, circumstantial evidence and hearsay evidence, in addition to evidence gathered after rate filing of the complaint.  *See $506,231 in U.S. Currency*, 125 F.3d at 451; *United States v. $304,980 in U.S. Currency*, 2013 WL 785113, at *2; 18 U.S.C. § 983(c)(2).

In support of its Motion for Summary Judgment, the Government relies on undisputed factual admissions from its Requests for Admissions dated October 21, 2022 (Doc. 33).  Many of these factual admissions are also contained in the declaration of TFO Brantley (Doc. 1-1).  Claimant failed to respond to the Government's Requests for Admissions dated October 31, 2022 (Doc. 33).  Fed. R. Civ. P. 36(a) states that if a party fails to respond to a request for an admission within 30 days after being served, the matter

is deemed to admitted.  *See also Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 605 (7th Cir. 2002); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987). Further, any "matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b).

To date, and despite filing other motions in January 2023, April 2023, and August 2023 (Docs. 35, 37, 39), Claimant has not filed a motion to withdraw or amend his admissions.  Thus, Rule 36(b) requires the Court to consider the facts included in the Government's Requests for Admissions (Doc. 33) as "conclusively established." *Nelson v. Wal-Mart, Inc.*, 63 F. App'x 920, 922–23 (7th Cir. 2003) (citing *Kasuboski*, 834 F.2d at 1350) (Fed. R. Civ. P. 36(b) requires the district court to consider these matters conclusively established); *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003) (default admissions under Rule 36 may serve as the factual predicate for summary judgment); *Hardwick v. John & Mary E. Kirby Hosp.*, 860 F. Supp. 2d 641, 649–50 (C.D. Ill. 2012) ("Admissions, including default admissions, must be treated as conclusively established for purposes of summary judgment, and it is error for a district court judge not to give an admission such effect."); *United States v. One Glock Model 21 .45 Caliber Pistol with Serial No. AAZ606US*, No. CIV. 11-221-GPM, 2011 WL 6754057, at *3 (S.D. Ill. Dec. 23, 2011) (collecting cases).

By failing to respond to the Government's Request for Admissions, Claimant admitted to the following facts:

1. On January 14, 2021, Drug Enforcement Administration (DEA) Task Force Officer Brad Blake (TFO Blake) and Task Force Officer Larry Brantley (TFO Brantley), conducted a traffic stop on a black 2007 Toyota Rav4 bearing an Oklahoma registration for improper lane usage. The traffic stop occurred on Interstate 55 southbound at mile marker 18, in Madison County Illinois.

The registration of the vehicle returned to Wei CHEN, of Elk City, Oklahoma.

2. TFO Blake exited the patrol vehicle and approached the passenger side of the vehicle to contact the driver, who identified himself as the registered owner, Wei CHEN. TFO Blake informed CHEN the reason for the traffic stop and requested CHEN produce his driver's license. CHEN produced an Oklahoma driver's license and handed it to TFO Blake. TFO Brantley approached the vehicle behind TFO Blake and retrieved CHEN's identification to start processing the traffic stop. TFO Brantley returned to the patrol vehicle while TFO Blake remained at the passenger side window to speak with CHEN.

3. CHEN told TFO Blake that he had traveled to New York, New York to visit family. CHEN said he visited with his family for two days and was traveling back home to Oklahoma. CHEN told TFO Blake he has been traveling to New York for the past five or six years and explained that he owned a Chinese buffet restaurant.

4. TFO Blake returned to CHEN's vehicle and returned CHEN's driver's license and concluded the traffic stop by issuing CHEN a verbal warning. TFO Blake then asked CHEN if there was anything illegal inside the vehicle and gave examples, including marijuana, cocaine, methamphetamines, heroin, illegal weapons, and large amounts of United States Currency. CHEN responded "no" to everything mentioned by TFO Blake. TFO Blake asked CHEN if it was ok if the TFOs searched the vehicle and Chen refused. TFO Blake informed CHEN that the vehicle would be detained for a K9 sniff. TFO Blake returned to the patrol vehicle while TFO Brantley contacted TFO Jake Degener (TFO Degener) to respond to the traffic stop with his K9, Blu.

5. A short time later, TFO Degener and TFO Kyle Waddington (TFO Waddington) arrived. TFO Degener deployed his K9 Blu and conducted a free air sniff of the vehicle. CHEN remained inside of the vehicle while K9 Blu sniffed the exterior of CHEN's vehicle. K9 Blu indicated on the vehicle for the odor of narcotics.

6. TFO Kevin Thebeau (TFO Thebeau) and TFO Angelque Sarmento (TFO Sarmento) arrived on scene after the K9 sniff and assisted with the search of CHEN's vehicle. Upon searching the rear passenger area of the vehicle, TFOs located several rubber banded bundles of United States currency inside of plastic grocery bags underneath the rear bench seat. TFOs also

located additional bundles of United States currency inside of plastic grocery bags underneath the front driver's bucket seat.

7. After locating the United States currency, TFO Brantley removed the bags from CHEN's vehicle and placed them on the hood of the patrol vehicle. TFO Brantley asked CHEN if the currency belonged to him, and CHEN responded that it did. TFO Brantley asked CHEN if he knew how much currency was inside of the vehicle and CHEN stated "One-hundred and twenty-thousand." TFO Brantley repeated CHEN's answer to confirm the amount and then asked if there was any more currency inside the vehicle. CHEN stared towards the vehicle but did not answer. After the United States currency was collected from the vehicle, TFO Blake secured handcuffs on CHEN for suspicion of Money Laundering.

8. TFO Degener placed the undetermined amount of United States currency into Self-Sealing Evidence Envelope (SSEE) #M000051284, as witnessed by TFO Waddington. Before TFO Degener sealed the envelope, he asked CHEN if the United States currency belonged to him, and CHEN responded by saying "yes." CHEN also said the United States currency was not all his and explained that the currency belonged to multiple people. The envelope was then sealed in the presence of CHEN by TFO Degener. TFO Degener secured the United States currency in his patrol vehicle for transport to the Fairview Heights Resident Office (FHRO).

9. TFO Thebeau secured CHEN in the front passenger side seat of his patrol vehicle and transported him to the FHRO for processing. TFO Sarmento transported CHEN's vehicle to the FHRO for processing. All TFOs left the scene of the traffic stop and relocated to the FHRO to assist with processing.

10. Upon arrival at the FHRO, TFOs escorted CHEN into a secure booking area. During a more thorough search of the vehicle, TFO Brantley located miscellaneous paperwork describing a marijuana cultivation business named Chen's Green Farms LLC located in Elk City, Oklahoma.

11. After CHEN was processed, TFO Thebeau conducted an audio/video interview with CHEN.

12. On the same date, TFO Sarmento recorded a video of the K9 sniff performed by TFO Degener and K9 Blu on the seized currency. TFO Degener informed TFO Sarmento that K9 Blu gave a positive indication for the odor of narcotics on the seized currency.

13. On January 15, 2021, TFO Degener and TFO Waddington transported the seized currency to Loomis for an official count. The total was determined to be $146,400.00.

14. That as of January 14, 2021, Claimant Wei Chen was engaged in the business of marijuana cultivation or was planning to engage in the business of marijuana cultivation.

15. That on January 14, 2021, Claimant Wei Chen told the TFOs that $20,000 of the $146,400.00 in United States Currency seized from him on that date belonged to him and the remainder belonged to other people.

16. That during a June 4, 2021 interview with TFOs, Wenxin Ouyang stated that he loaned you $100,000 in currency during late 2020 or early 2021 and the currency was provided to you in New York City, NY.

17. That during a June 4, 2021 interview with TFOs, Wenxin Ouyang stated that the $100,000 in currency he provided Claimant Wei Chen during late 2020 or early 2021 remained his property when it was seized.

18. That Wenxin Ouyang also lives in Oklahoma.

19. That Wenxin Ouyang is also engaged in the cultivation of marijuana and was engaged in the cultivation of marijuana at the time $146,400.00 in United States Currency was seized from Claimant Wei Chen.

20. The $146,400.00 in United States Currency seized from Claimant Wei Chen on January 14, 2021 is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801 *et seq.*

21. That the $146,400.00 in United States Currency seized from Claimant Wei Chen on January 14, 2021 is property which is subject to forfeiture.

(Doc. 33).

Because Claimant admitted that the $146,400.00 in United States Currency seized from him on January 14, 2021 is property which "constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds

20

traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801"
and is subject to forfeiture, the Government is entitled to summary judgment.

Moreover, even without Claimant's admissions, the undisputed evidence offered
by the Government through the declaration of TFO Brantley (Doc. 1-1) also establishes
that the currency were the proceeds of, or intended to facilitate, illegal drug transactions.
Specifically, and as further outlined above, TFO Brantley confirmed that the $146,400.00
found in plastic bags in Claimant's vehicle was subjected to a K9 sniff test on January 21,
2021, and resulted in a positive indication for the odor of narcotics (Doc. 1-1, ¶¶ 15-16).
TFO Brantley also described paperwork that was recovered from Claimant's vehicle
describing Claimant's marijuana cultivation business named Chen's Green Farms LLC
located in Elk City, Oklahoma (Doc. 1-1, ¶ 13).

"Along with other relevant factors, a positive alert from a trained narcotics
detector can 'demonstrate[] a link between the cash and illegal drug activity sufficient for
the government to prevail in its forfeiture action." *United States v. $115,020.00 in United
States Currency*, No. 17-CV-307-DRH-DGW, 2018 WL 722556 (S.D. Ill. Feb. 6, 2018) (citing
*Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 453).  Accordingly, the
Government has met its burden to prevail on summary judgment, and Claimant has not
offered contrary evidence which a finder of fact could infer that he owned the funds
legitimately.  *See, e.g.*, *United States v. $353,443 In U.S. Currency*, 701 F. App'x 493, 498 (7th
Cir. 2017) ("Once the government met its burden of introducing evidence that the
property was subject to forfeiture, the burden shifted to [Claimant] to offer evidence of
legitimate ownership.").

21

Finally, to the extent Claimant seeks to rely on his statement of ownership from his verified claim as evidence in support of his ownership and against forfeiture, the Court observes that this statement does not create a genuine issue of material fact. *See LINC Finance Corp.*, 129 F.3d at 920 ("[A] genuine issue of material fact is not shown by the mere existence of 'some alleged factual dispute between the parties,' or by 'some metaphysical doubt as to the material facts,' . . . [but] only if 'a fair-minded jury could return a verdict for the non-moving party on the evidence presented.'") (internal citations and markings omitted).  In his claim, Claimant states that the currency was comprised of his "personal savings and money borrowed … for the purpose of starting and maintaining a garden supplies and home renovation business." (Doc. 21).  This statement is not inconsistent with the Government's evidence that the currency seized was involved with Claimant's cultivation business, Chen's Green Farms LLC, but merely omits the Government's additional evidence that the cultivation business was engaged in the cultivation of marijuana.  Regardless, this statement does not overcome Claimant's subsequent admissions that the currency is subject to forfeiture as money used to facilitate a violation of 21 U.S.C. § 801.  *See Hardwick*, 860 F. Supp. 2d at 649–50 (citing *McCann*, 337 F.3d at 788) ("Admissions, including default admissions, must be treated as conclusively established for purposes of summary judgment, and it is error for a district court judge not to give an admission such effect.").

In sum, the undisputed material facts—including the positive alert to the currency, the paperwork found in Claimant's vehicle describing his marijuana cultivation business, and Claimant's admissions that he is engaged in the cultivation of marijuana and the

currency seized from his vehicle constituted money subject to forfeiture as money used to facilitate a violation of 21 U.S.C. § 801—demonstrate that the currency was substantially connected to illegal drug trafficking and properly subject to forfeiture under 21 U.S.C. § 801 and 18 U.S.C. § 983.   The Government is thus entitled to summary judgment.

## Conclusion

For these reasons, Claimant Wei Chen's Motion to Suppress (Doc. 35) is **DENIED**, and the Government's Motion for Summary Judgment (Doc. 34) is **GRANTED**.

**SO ORDERED.**

Dated:  August 30, 2023

_____
DAVID W. DUGAN
United States District Judge